**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **LORETTA JANE CROSS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08CV00009 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,** | ) | By: James P. Jones<br>Chief United States District Judge |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

*Ginger J. Largen, Morefield & Largen, P. L. C., Abingdon, Virginia, for Plaintiff; Jillian Kipp, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

The plaintiff Loretta Cross filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to titles II and XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433, 1381-1383 (West 2003 & Supp. 2009). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 1383(c)(3) and § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decision. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff protectively filed for DIB and SSI benefits on March 2, 2006, alleging disability beginning June 30, 2003.[1] (R. at 57, 60, 82.) The plaintiff claimed disability by reason of vasovagal syncope, irritable bowel syndrome ("IBS"), lower back problems, depression, anxiety, stress, and bipolar disorder. (R. at 61.) Her claim was denied initially on July 27, 2006 (R. at 38-40), and upon reconsideration on February 20, 2007 (R. at 32-34). At her request, the plaintiff received a hearing before an administrative law judge ("ALJ") on July 26, 2007. (R. at 343-88.) At that time, a vocational expert and the plaintiff, who was represented by counsel, testified.

---

[1] The plaintiff previously applied for DIB, but the claim was denied at the state agency level on May 10, 2004, and was not pursued further. (R. at 57-58.)

(*Id.*) By decision dated August 20, 2007, the ALJ denied the plaintiff's claims for DIB and SSI benefits. (R. at 11-23.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but her request was denied on July 11, 2008. (R. at 5-8.) Thus, the ALJ's opinion dated August 20, 2007, constituted the final decision of the Commissioner. The plaintiff then filed her Complaint with this court on April 10, 2008, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed and argued the issues. The case is now ripe for decision.

II

The summary judgment record reveals the following facts. Cross was forty-seven years old at the time of the ALJ's decision denying benefits (R. at 57), a younger individual under the regulations. *See* 20 C.F.R. § 416.963(c) (2009). She has completed one year of college with secretarial training. (R. at 65.) Cross has past relevant work experience as an administrative assistant with UPS (R. at 62), but has not engaged in substantial gainful activity since June 30, 2003. She claims disability

based on vasovagal syncope, IBS, lower back problems, depression, anxiety, and bipolar disorder. (R. at 61.)

The medical evidence reflects that Cross has a history of vasovagal syncope and that James H. Bowman, M.D., treated the plaintiff from 1982 until his retirement. (R. at 138.) Over the past twenty years, Cross has had fainting and passing out spells. (R. at 212.) John D. Sherrill, M.D., a family physician, has seen Cross since 1997. (R. at 113.) Cross has had annual episodes of vasovagal syncope, along with headaches and dizzy spells, since 1999, sometimes noted as stress related. (R. at 19, 147-211.) On May 2, 2002, Cross requested that Dr. Sherrill send a letter to UPS stating that she needed to miss work from April 8 to June 10, 2002, due to her vasovagal syncope, and Dr. Sherrill complied. (R. at 188, 301.) Cross takes medication to help with this disorder.

Cross also sought medical care for degenerative disc disease in the lumbar spine. The plaintiff saw Dr. Sherrill on March 29, 2000, and complained of pain in the right lower back due to pushing a car. Cross was diagnosed with acute lumbar strain and prescribed medication. (R. at 208.) Cross again suffered from acute lumbar strain on March 19, 2001, and Dr. Sherrill prescribed medication and a work excuse for six weeks. (R. at 201, 303.) An MRI taken on May 4, 2001, showed a broad based disc protrusion, and physical therapy was recommended. (R. at 200.)

At an appointment on May 23, 2001, Dr. Sherrill noted that Cross was going to the Therapy Center, where she was under the care of Jack Kilbreath, therapist, for her back. (R. at 199.) Cross missed work from June 18, 2001, until September 24, 2001, during which time Dr. Sherrill noted no progress in physical therapy. (R. at 193, 304-305.) Dr. Sherrill wrote a work excuse on October 22, 2002, stating that Cross was continuing FMLA disability leave form June 12, 2002, until further notice. (R. at 306.) Dr. Sherrill consulted a neurosurgeon on September 5, 2001, who recommended aqua therapy at the Wellness Center three times weekly for three weeks. (R. at 194.) The neurosurgeon also raised the plaintiff's restrictions on lifting from five to twenty pounds and stated that she could go back to work. (R. at 194.) Cross went to see Paul Peterson, M.D., for a second opinion; Dr. Peterson did not believe she was a surgical candidate. (R. at 178.)

On June 10, 2004, Dr. Sherrill set weight restrictions at forty pounds and released her to return to work with a letter of restrictions, which included adequate bathroom breaks, a cool environment, and weight restrictions. (R. at 159.) On May 10, 2006, Cross went to see Dr. Sherrill complaining of pain in her right upper back. Dr. Sherrill attributed this to the plaintiff lifting her father and gave her samples of Lidoderm patches. (R. at 327.)

Cross was diagnosed with IBS in 2003 by Dr. Sherrill and was treated with medication. (R. at 175.) Dr. Sherrill noted on April 30, 2003, that Cross was constipated, bloated, and had abdominal pain with occasional diarrhea. (*Id.*) On August 10, 2006, Cross called Dr. Sherrill to get a prescription phoned into her pharmacist for severe abdominal pain consistent with diverticulitis. (R. at 139.)

On September 1, 1999 Dr. Sherrill treated Cross for depression. He attributed her state of mind to the fact that her husband had left her and to menopause. He prescribed medication and set up an appointment with the Therapy Center. (R. at 211.) Dr. Sherrill rechecked Cross for adjustment disorder on March 29, 2000, at which time he believed "things [were] stabilizing." (R. at 208.) He continued to prescribe medication for the depression and also for anxiety and insomnia. (*Id.*) Cross became even more depressed on May 18, 2005, after her older brother passed away and she was left to take care of her parents with very little help. She was given medication and scheduled for another appointment at a later date. (R. at 147.)

The record reflects that Cross returned to the Bristol Regional Counseling Center on April 25, 2006, with complaints of mood swings and crying spells. (R. at 253.) She was seen by Billy J. Manuel, LPC, and Steve Herrin, M.D. Manuel worked with Cross to reduce her depression and increase her coping skills, which he recommended doing at least once per month in individual sessions. (R. at 260.) In

a medical assessment written on July 19, 2007, Manuel wrote that the "client appears to have difficulty in memory, rational thinking, and composure under stress." (R. at 323.) Manuel also indicated that Cross had poor to no ability to maintain attention and concentration, to deal with the public, and deal with work stresses. (R. at 20, 322.)

Dr. Herrin worked with Cross in psychological and chemical therapy sessions at the Bristol Regional Counseling Center beginning on December 27, 2006, and continuing into 2007. On December 27, 2006, Dr. Herrin diagnosed Cross with bipolar disorder and dysthymic disorder and increased the dosage of Depakote for bipolar disorder. He noted that the "patient appears to be relatively stable but still with evidence of hypomania and anxiety." (R. at 242.) On February 5, 2007, Dr. Herrin listed Cross's mood as "euthymic with appropriate affect" and told her to return in three months. (R. at 239.) Cross saw Dr. Herrin again on April 30, 2007, at which time he described her as "clinically improved but still disabled due to mood swings and very low frustration tolerance." (R. at 317.)

The plaintiff returned for another therapy session on July 16, 2007, and was seen by George Harold Naramore, M.D. During this session, Cross told Dr. Naramore that she felt "down," had "mild irritability," and continued to "not feel good." (R. at 311.) Dr. Naramore stated that Cross was "mildly dysphoric" and

"mild[ly] to moderately anxious." (*Id.*) Dr. Naramore increased the plaintiff's dose of Risperdal and told her to return in six weeks. (*Id.*)

At the request of the Virginia Department of Rehabilitative Services, Cross was examined by William Humphries, M.D., on July 12, 2006. (R. at 332.) During the examination, Cross told Dr. Humphries that her last episode related to vasovagal syncope had been about two weeks prior. (R. at 212.) She passed out for about two minutes, but did not bite her tongue or lose continence. (*Id.*) She stated that these episodes occurred two or three times per month. (*Id.*) Cross also had grand mal seizures about twice per year in which she would pass out and shake and jerk, but not bite her tongue or loose bowel or bladder control. (*Id.*) Dr. Humphries noted that the plaintiff had endometriosis, which causes urinary inconsistences, and also arthritis, chronic low back pain, and IBS. (R. at 212-13.) The plaintiff was described as "alert and pleasant" and "in no distress." (R. at 213.) Dr. Humphries indicated that Cross's range of motion in her extremities was normal in almost all respects. (R. at 216.) Based on his evaluation, Dr. Humphries concluded that the plaintiff "would be limited to sitting, standing and walking six hours in an eight-hour workday, lifting 50 pounds occasionally and 25 pounds frequently. There would be no restriction on climbing, stooping, kneeling, crouching or crawling. She should avoid heights, hazards and fumes." (R. at 215.)

In Function Reports submitted to the Social Security Administration on June 9, 2006, and November 28, 2006, the plaintiff stated that she could drive, pay her bills, do light cleaning, do laundry, and go shopping. (R. at 74, 76, 97.) She was able to take care of her parents by shopping for them, taking them to the doctor, ensuring that they took their medications, paying their bills, and talking to them on the phone daily. (R. at 77, 95, 101.) The plaintiff enjoyed reading the Bible and medical books, watching television, and talking with friends and family. (R. at 77, 98.)

As part of the disability determination, Donald Williams, M.D., a state agency physician, completed a form on July 19, 2006, assessing the plaintiff's physical residual functional capacity ("RFC"). (R. at 218-24.) Dr. Williams concluded that the plaintiff could perform a range of light work. (*Id.*) Another consultant, Frank M. Johnson, M.D., considered additional evidence in assessing the plaintiff's physical RFC on February 20, 2007, and also opined that the plaintiff could perform a range of light work. (R. at 276-82.)

On July 24, 2006, Eugenie Hamilton, Ph.D., a state agency psychologist, found that the plaintiff had a non-severe mental impairment which did not satisfy Listing 12.04 (Affective Disorders). (R. at 225, 228.) Specifically, he found that the plaintiff had "mild" limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (R. at 235.) He further concluded that the

plaintiff had no repeated episodes of decompensation of extended duration. (R. at 235.) Another state agency psychologist, Richard Milan, Jr., Ph.D., considered additional evidence in assessing the plaintiff's mental RFC on February 20, 2007. (R. at 283-85.) Dr. Milan determined that despite her mental impairment, the plaintiff was capable of understanding, remembering, and carrying out simple work instructions under ordinary supervision with only occasional difficulty sustaining concentration; she could interact adequately with others in a work setting; and she could adjust to changes and maintain personal safety. (R. at 285.) He concluded that the plaintiff could meet the basic mental demands of competitive work on a sustained basis despite the limitations arising from her mental impairments. (*Id.*) Dr. Milan further opined that the plaintiff did not meet Listing 12.04 (Affective Disorders). (R. at 289.) He found that the plaintiff was mildly limited in activities of daily living; mildly limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, and pace; and that she had no repeated episodes of decompensation of extended duration. (R. at 296.)

The evidence in this case also includes the plaintiff's testimony regarding her subjective claims and her activities of daily living. The plaintiff testified that although she had worked for UPS for sixteen years, she could not return to work there because the employer would not accept lifting limitations of under seventy pounds

and would not give her frequent bathroom breaks. (R. at 348, 360-61.) Cross opined that she could not handle a job in payroll with a different employer because of the stress that employment caused for her. (R. at 364-65.)

Following the plaintiff's testimony, a vocational expert, Leah Perry Salyers, testified regarding jobs available for a hypothetical individual of the same age, experience, educational background, and RFC as the plaintiff. (R. at 383-88.) The ALJ described the hypothetical individual as able to do light exertion; never climbing ladders, working at heights or with dangerous machinery; occasional balancing, kneeling, crouching, crawling, and stooping; and working in a temperature controlled environment. This individual's ability to concentrate would be moderately reduced and she would therefore be limited to simple, non-complex tasks; and she should work in a self-contained setting with no more than occasional contact with co-workers. (R. at 383-84.) The vocational expert testified that such an individual could perform jobs as an unskilled clerical worker and as a lab sampler. (R. at 384-85.) The vocational expert testified that there were 7000 such jobs in the region and 152,000 such jobs in the national economy. (*Id.*)

The ALJ then asked the vocational expert whether the same hypothetical person would have any job opportunities if she were subject to the additional limitations the plaintiff alleged. (R. at 385.) The vocational expert opined that no



Case 1:08-cv-00009-JPJ-PMS Document 20 Filed 09/29/09 Page 11 of 17 Pageid#: 457

jobs would be available to such an individual. (R. at 385-86.) She also testified that if the hypothetical individual missed more than two days of work in one month, the jobs that she had identified would not be available. (R. at 387.)

In light of the evidence, the ALJ determined that Cross was capable of making a successful adjustment to other work and was not disabled as defined in the Social Security Act. (R. at 22-23.)

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

The Commissioner applies a five-step sequential evaluation process in assessing DIB and SSI claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could

return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2009). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The fourth and fifth steps in this inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. §§ 404.1560(b)-(c), 416.960(b)-(c) (2009).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as

long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays*, 907 F.2d at 1456.

The plaintiff contends that the ALJ's decision was not supported by substantial evidence. Specifically, the plaintiff argues that the ALJ failed to consider the cumulative effect of all of the plaintiff's medical problems and erred in concluding that the plaintiff could perform substantial gainful activity based on her self-reported activities of daily living. I disagree.

The ALJ properly considered the plaintiff's impairments singly and in combination in determining whether the plaintiff was disabled. *See* 20 C.F.R. §§ 404.1523, 416.923 (2009). The ALJ reviewed the medical evidence relating to each of the plaintiff's alleged impairments, including degenerative disc disease (R. at 17, 19), vasovagal syncope (R. at 19), IBS (R. at 20), and depression and bipolar disorder (R. at 20). The ALJ then discussed the limitations arising from the combination of the plaintiff's impairments in assessing her RFC. (R. at 21.) Specifically, the ALJ found that due to her back impairment, the plaintiff was precluded from heavy lifting and could only occasionally bend, stoop, and kneel; vasovagal syncope prevented her from working around heights and dangerous machinery; and mental impairments limited her to simple, non-complex tasks and only occasional interaction with co-workers. (R. at 21.) The vocational expert testified that a person with these

limitations, arising from the combination of the plaintiff's impairments, would be capable of performing work existing in significant numbers in the national economy. (R. at 383-84.) Thus, the ALJ's conclusion that the plaintiff's combination of impairments did not make her disabled under the Act was supported by substantial evidence.

In addition, it was proper for the ALJ to consider the plaintiff's self-reported activities of daily living in assessing whether she could engage in substantial gainful activity. In fact, the ALJ was required to consider these activities in assessing the plaintiff's RFC and the credibility of her subjective complaints. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (2009). The plaintiff maintained that she was able to drive, pay her bills, do light cleaning, do laundry, go shopping, watch television, read, talk on the phone, and care for her parents. (R. at 74, 76, 77, 95, 97, 98, 101.) This was all relevant evidence as to the plaintiff's ability to engage in substantial gainful activity. The ALJ also considered the plaintiff's testimony at the hearing, in which the plaintiff specified some limitations to the above-listed activities. (*See* R. at 19 ("The claimant testified she has hired someone to care for her parents; but still controls their medications and shops for them.").)

Further, the ALJ's conclusions regarding the plaintiff's RFC are supported by substantial evidence in the record. The objective medical evidence shows that

medication helped relieve symptoms due to IBS and vasovagal syncope. (R. at 172, 188.) Despite her degenerative disc disease, the plaintiff had a full range of motion in her neck and extremities, with only slightly reduced range of motion in her back. (R. at 213.) Furthermore, her treatment providers frequently encouraged her to return to work. (R. at 159, 163, 164, 166, 167, 176, 193.) Dr. Humphries opined that the plaintiff could perform a range of medium work, and the state agency physicians determined that the plaintiff could perform a range of light work. (R. at 215, 218-24, 276-82.)

Medical evidence also suggests that the plaintiff's mental impairment was not debilitating. Although she suffered from depression, particularly after her brother's death, the plaintiff's mental health providers noted that she improved with treatment. (R. at 239, 313, 327, 340.) Also, Dr. Milan determined that despite her mental impairment, the plaintiff was capable of understanding, remembering, and carrying out simple work instructions under ordinary supervision with only occasional difficulty sustaining concentration; she could interact adequately with others in a work setting; and she could adjust to changes and maintain personal safety. (R. at 285.) He concluded that the plaintiff could meet the basic mental demands of competitive work on a sustained basis despite the limitations arising from her mental



Case 1:08-cv-00009-JPJ-PMS Document 20 Filed 09/29/09 Page 16 of 17 Pageid#: 462

impairments. (*Id.*) Thus, the ALJ's findings regarding the plaintiff's RFC are supported by substantial evidence.

Accordingly, I find that there is substantial evidence to support the ALJ's decision.

## IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: September 29, 2009

/s/ JAMES P. JONES
Chief United States District Judge